# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS – HOUSTON DIVISION

International Document Notice to Agent is Notice to Principal – Notice to Principal is Notice to Agent

United States Courts
Southern District of Texas
FILED

DEC 0 2 2025

Nathan Ochsner, Clerk of Court

**Rachael Griffin-El, sui juris,**

Plaintiff,


v.                          Civil Action No. 4:25-cv-02013


**Jamie Dimon**, a living man, doing business as CEO

for JPMorgan Chase Bank, N.A.,

and **JPMorgan Chase Bank, N.A.,**

Defendants.

---

# PLAINTIFF'S SUR-REPLY TO DEFENDANTS' REPLY IN SUPPORT OF

# DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

---

Plaintiff, Rachael Griffin-El, sui juris, respectfully submits this Sur-Reply to address the material misstatements, omissions, and inaccuracies contained in Defendants' Reply (Doc. 57) filed in support of their Motion to Dismiss the First Amended Complaint (Doc. 52).

This Sur-Reply is necessary to prevent the Court from being misled by Defendants' continued efforts to:

- recast issues Plaintiff never raised;
- ignore controlling defects in standing, securitization, and chain of title; and
- mischaracterize Plaintiff's pleadings as "new claims" or "nonsensical."

This Sur-Reply is submitted without waiving Special Appearance, without conceding jurisdiction, and with all rights reserved under U.C.C. § 1-308.

---

# I. DEFENDANTS MISSTATE THE ISSUES AND MISCHARACTERIZE PLAINTIFF'S FILINGS

Defendants repeatedly assert that Plaintiff's 46-page Response "does not address pleading deficiencies" and "relies on nonsensical arguments." That assertion is inaccurate, misleading, and contrary to federal pleading rules and established stare decisis.

Plaintiff's Response directly addressed—with specificity, statutory authority, and case law—the following dispositive issues:

- lack of standing under UCC §§ 3-301, 3-308, and 9-203;
- lack of privity and lack of negotiation of the alleged note;
- securitization and bifurcation of the note (violating Carpenter v. Longan, 83 U.S. 271 (1872));
- trust-estate jurisdiction and the recorded R L FREEMAN TRUST (RP-2025-13788);
- treaty-protected nationality under Article VI, Clause 2 of the U.S. Constitution;
- federal disclosure violations under TILA (15 U.S.C. §§ 1601–1667f; Regulation Z);
- federal debt-collection violations under FDCPA (15 U.S.C. § 1692 et seq.);
- FCRA violations (15 U.S.C. § 1681 et seq.);
- fraudulent assignments and chain-of-title defects;
- absence of subject-matter, personal, and territorial jurisdiction; and
- foreclosure and eviction conducted during an active federal proceeding in violation of 28 U.S.C. § 1446(d).

Defendants' Reply does not engage with these controlling issues. Instead, Defendants rely on conclusory labels such as "nonsensical," "unsupported," and "irrelevant." These assertions are rhetorical—not legal—and cannot support dismissal.

Federal Law Forbids Dismissal Based on Conclusory Characterizations

1. FRCP 8(a)(2).

   Requires only a "short and plain statement" showing entitlement to relief. Plaintiff provided a detailed 46-page filing with statutes, facts, and evidence.

2. Rule 12(b)(6) and Rule 12(d).

   The Court must accept Plaintiff's factual allegations as true:

   o Ashcroft v. Iqbal, 556 U.S. 662 (2009)

- ○ Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)

Labels and accusations are not grounds for dismissal.

3. Fifth Circuit Authority.

The Fifth Circuit is clear: "Conclusory statements do not constitute a rebuttal."

- ○ EPCO Carbon Dioxide Prods. Inc. v. JP Morgan Chase Bank, 467 F.3d 466, 470 (5th Cir. 2006)
- ○ Johnson v. City of Shelby, 574 U.S. 10 (2014)

Defendants' Reply violates these standards.

A conclusory insult is not a rebuttal. Silence on the merits is not a defense. At this stage, the Court must accept Plaintiff's factual allegations as true. Defendants' failure to engage those facts cannot be used as a basis for dismissal.

Additional Clarification: Plaintiff Was the Only Signatory on the Alleged Promissory Note

For the record:

- Plaintiff was the only party who signed the instrument.
- Neither Jamie Dimon nor JPMorgan Chase Bank, N.A. signed it.
- Under UCC §§ 3-401 & 3-403:
  - ○ A party is not liable on a note unless they signed it;
  - ○ Non-signers cannot enforce an instrument without lawful negotiation and value.

Because:

1. Long Beach Mortgage Company—not Chase—was the originating entity;
2. Long Beach is defunct and Washington Mutual collapsed;
3. The FDIC Purchase & Assumption Agreement did not transfer borrower liabilities to Chase;
4. No continuous chain of negotiation has been produced;
5. Defendants refuse presentment of the original note in violation of UCC § 3-501 and TILA;

Defendants have:

- no signature,
- no consideration,
- no privity,
- no negotiation,
- no standing,
- and no enforceable claim.

Under TILA, Regulation Z, RESPA, and the UCC, Plaintiff has every right to demand:

- presentment,
- accounting,
- the true creditor identity,
- the source of funds,
- all assignments and transfers.

Defendants have provided none. This confirms Plaintiff's argument: no lawful contract was ever formed.


## II. DEFENDANTS MISCHARACTERIZE PLAINTIFF'S USE OF "DISCHARGE" AND IMPROPERLY INJECT BANKRUPTCY

Judicial estoppel applies only where a party has (1) taken a clearly inconsistent position, (2) that was accepted by a court, and (3) gained an unfair advantage thereby. Plaintiff's position is not inconsistent. In bankruptcy, Plaintiff disclosed the existence of Defendants' claimed mortgage interest under compulsion of the forms; in this Court, Plaintiff challenges the underlying transaction as void ab initio for lack of consideration, securitization, and fraud. Disclosure of a disputed claim in bankruptcy is not an admission that the obligation is valid, nor does it estop Plaintiff from later showing that the underlying instrument was void from inception.

Defendants repeatedly accuse Plaintiff of raising "bankruptcy discharge." This is false, misleading, and contradicts the record.

Clarification: Plaintiff Mentioned Bankruptcy ONLY to Correct Defendants' Mischaracterization

Plaintiff did not reference bankruptcy as a claim, defense, or basis for relief. Defendants themselves injected bankruptcy into the case and repeatedly misrepresented Plaintiff's use of the term "discharge."

Plaintiff's filings refer to commercial discharge at inception—not bankruptcy discharge.

Commercial discharge at inception means:

- No lawful consideration was furnished at closing;
- The alleged note was immediately monetized and securitized;
- Liability was extinguished under HJR-192 (1933); 12 U.S.C. § 95a(2); UCC §§ 3-303 & 3-601;
- An instrument created from Plaintiff's signature cannot serve as consideration for itself.

This is a contract-law issue, not a bankruptcy issue.

Plaintiff Raised Bankruptcy ONLY to Correct Defendants' Distortion

- Plaintiff did not rely on bankruptcy in any claim.
- Plaintiff used the term "discharge" in the commercial sense, not bankruptcy sense.
- Plaintiff clarified the distinction only because Defendants repeatedly misused the term.

Thus:

- It does not validate Defendants' lien,
- It does not establish privity or standing,
- It does not waive objections based on fraud, securitization, lack of consideration, or void instruments.

Footnote 1

Commercial discharge at inception—where no lawful consideration is given and the instrument is monetized—renders the obligation void under UCC §§ 3-303 and 3-601. Fraudulent or void instruments cannot be validated through later proceedings, including bankruptcy. See United States v. Throckmorton, 98 U.S. 61 (1878) ("Fraud vitiates everything it touches.")

---

## III. DEFENDANTS' STATEMENT THAT PLAINTIFF "FORMERLY HAD AN INTEREST" IN THE PROPERTY CONFIRMS THEIR OWN NOTICE, TITLE, AND JURISDICTIONAL DEFECTS

In their Reply, Defendants assert that Plaintiff "formerly had an interest" in 703 Deveron Lane. That statement is:

1. factually false,
2. legally fatal to Defendants, and
3. a binding judicial admission against interest.

The complete record shows that Defendants knew — months before any foreclosure actions — that Plaintiff was not the record owner at the time of foreclosure, and that the R L FREEMAN TRUST held full title.

### A. Defendants Had Notice of the Trust From the Beginning — December 2024 Through April 2025

Before addressing Defendants' judicial admissions, it is essential to establish the full timeline of notice Defendants had before attempting foreclosure. The sequence is undisputed and supported by certified-mail evidence:

1. December 30, 2024 – Plaintiff, as Grantor, created an allodial private irrevocable trust.
2. January 10, 2025 – Defendants received Exhibit B ("Memorandum of Trust / Adverse Claim / Affidavit of Fact of Reversionary") by Certified Mail.
   - Defendants did not rebut, deny, contest, or challenge the Trust at any time.

    o   Under commercial and trust law, silence = acquiescence.

3.  April 4, 2025 – After Defendants failed to rebut the original Trust notice, Plaintiff lawfully converted and conveyed the estate into the R L FREEMAN TRUST.

4.  April 15, 2025 – The conveyance into the R L FREEMAN TRUST was recorded in Harris County under RP-2025-13788.

This means Defendants had:

- Actual Notice (by certified-mail delivery Jan. 10, 2025);
- Constructive Notice (by public record April 15, 2025);
- Judicial Notice (supported by their own filings).

Yet Defendants never rebutted, never responded, and never served the record owner.

## B. Defendants Acknowledged the Trust As Early As June 26, 2025

On June 26, 2025, in their very first filing, Defendants expressly acknowledged:

- the R L FREEMAN TRUST existed,
- Plaintiff conveyed the property April 4, 2025, and
- the conveyance was recorded April 15, 2025 (RP-2025-13788).

This admission occurred months before:

- the attempted foreclosure,
- the purported trustee's sale,
- the eviction proceeding, and
- all subsequent actions now at issue.

Thus, Defendants possessed:

- actual knowledge,
- constructive knowledge, and
- judicial knowledge

before taking any action. This destroys their argument that the Trust is "irrelevant."

## C. Defendants Re-Acknowledged the Trust in Their November 7, 2025 Filing (Document 57-1, Exhibit D)

In Document 57-1, Exhibit D, page 28 of 125, Defendants again:

- identified the Trust,
- referenced the April 4, 2025 conveyance, and
- confirmed the April 15, 2025 recording.

This is their second judicial admission. Two acknowledgments = irrefutable knowledge.

Defendants cannot now claim:

- "We had no duty to respond."
- "The Trust is irrelevant."
- "Plaintiff was still the owner."
- "We did not know title had changed."

Their own filings contradict every word of their Reply.

## D. Texas Law Requires Notice to the Record Title Holder — the R L FREEMAN TRUST

Even assuming arguendo that a lien could survive a change in ownership, Texas law does not permit a mortgagee or servicer to foreclose against a former owner while ignoring the record title holder reflected in the county records and in its own filings. A surviving lien does not authorize foreclosure against the wrong party or without statutory notice.

Texas Property Code § 51.002(b)(3) provides that "notice of foreclosure must be sent to the record owner of the estate ." As of April 15, 2025, the record owner of location known as 703 Deveron Lane — by recorded instrument RP-2025-13788 — was the R L FREEMAN TRUST, not Plaintiff individually.

Despite having actual, constructive, and judicial knowledge of this fact (beginning with Defendants' own June 26, 2025 filing and reaffirmed in Document 57-1, Exhibit D), Defendants sent no notices to the Trust, mailed nothing to the Trust address, foreclosed in Plaintiff's individual name, and proceeded to evict Plaintiff individually, all while knowing that the Trust held title. Foreclosing against the wrong party is a fatal defect.

Under Texas and Fifth Circuit authority, a foreclosure conducted against a non-owner is VOID, not voidable. Onwuteaka v. Cohen, 846 S.W.2d 889 (Tex. App.—Houston [1st Dist.] 1993). A void foreclosure means:

- title never transferred,
- the purported sale is a legal nullity,
- the eviction collapses automatically,
- no later purchaser can cure the defect, and
- no court may enforce or rely upon a void act.

Because Defendants foreclosed: (1) without jurisdiction, (2) against the wrong party, (3) without notice to the record title holder, and (4) during active federal litigation, the entire process is void ab initio. A void foreclosure cannot serve as a basis for eviction, possession, title transfer, or Defendants' Motion to Dismiss.

## E. Defendants' Statement That Plaintiff "Formerly Had an Interest" Is a Binding Judicial Admission

By stating Plaintiff formerly held title, Defendants admit:

- Plaintiff did not hold title at the time of foreclosure,
- the Trust did hold title,
- foreclosure targeted the wrong party,
- jurisdiction over the Trust estate was absent, and
- notice and due process were violated.

This admission is binding under White v. ARCO Polymers, 720 F.2d 1391 (5th Cir. 1983). A judicial admission cannot be contradicted or withdrawn.

## F. Foreclosing Against the Wrong Party Violates Due Process and Voids the Entire Proceeding

Because Defendants:

- knew about the Trust,
- admitted the Trust twice in filings,
- ignored statutory notice requirements,
- acted without jurisdiction, and
- foreclosed against a non-owner,

their actions violated:

- Due Process (5th & 14th Amendments);
- Texas Property Code § 51.002(b)(3);
- Texas Property Code § 24.0061(b);
- Throckmorton, 98 U.S. 61 (fraud vitiates all).

A foreclosure conducted without jurisdiction is void ab initio.

## G. Conclusion of Section III

Accordingly, Defendants' own admissions — beginning January 10, 2025 (receipt of Trust documents), again June 26, 2025, and again November 7, 2025 — establish:

1. They knew the R L FREEMAN TRUST was the lawful record title holder;
2. They knew Plaintiff individually did not hold title at the time of foreclosure;
3. They knowingly violated Texas Property Code § 51.002(b)(3);
4. They foreclosed against the wrong party;
5. They evicted the wrong party;
6. They acted without jurisdiction and without due process.

Because notice, title, and jurisdiction are mandatory prerequisites to any foreclosure, Defendants' foreclosure is void ab initio. A void foreclosure cannot transfer title and cannot support a Rule 12(b)(6) dismissal. Defendants' own filings prove their foreclosure was void as a matter of law.

---

## IV. DEFENDANTS STILL CANNOT ESTABLISH STANDING — NO ORIGINAL NOTE, NO CONTRACT, NO ENFORCEMENT

Defendants' Reply avoids the central dispositive issue in this case: no Defendant possesses the original wet-ink promissory note, nor can any Defendant establish a lawful chain of negotiation, ownership, or consideration.

The law is unequivocal: Without the original note, properly negotiated under Articles 3 and 9 of the UCC, no party may enforce, foreclose, or rely upon a Deed of Trust. Defendants have not attempted—because they are unable—to meet these requirements.

### A. Defendants Cannot Produce the Original Wet-Ink Note or Any Continuous Chain of Negotiation

Under UCC §§ 3-301, 3-308, and 3-203, a party seeking to enforce a negotiable instrument must prove:

1. possession of the original wet-ink note;
2. proper endorsement and negotiation;
3. value given; and
4. a continuous chain from the originating creditor.

Defendants satisfy none of these requirements.

It is undisputed that:

- Long Beach Mortgage Company—not JPMorgan Chase Bank, N.A., and not Jamie Dimon (a living man)—was the alleged originating lender;
- Long Beach is defunct;
- Washington Mutual failed in 2008;
- the FDIC Purchase & Assumption Agreement expressly states JPMorgan Chase did not assume borrower liabilities.

Defendants have produced:

- no original note,
- no endorsements or allonges,
- no assignments,
- no proof of value,

- and no beneficial ownership.

Their silence on these foundational requirements constitutes a binding admission that they cannot meet the standing threshold.

## B. The Alleged Promissory Note Was Securitized and Converted Into an Investment Security Under 15 U.S.C. § 78c(a)(10)

The "Credit Agreement" (promissory note) and Deed of Trust bearing Plaintiff's wet-ink signature were statutorily classified as securities, not loans, under 15 U.S.C. § 78c(a)(10). Within nine months of the October 31, 2005 closing, the note was:

- monetized,
- pooled,
- securitized, and
- transferred into the secondary market.

This destroys privity and standing.

The U.S. Supreme Court held in Carpenter v. Longan, 83 U.S. 271 (1872):

## "The note and mortgage are inseparable... The assignment of the note carries the mortgage with it."

Here, the note was:

- separated,
- securitized,
- electronically converted,
- removed from the banking system, and
- transferred to unknown investors.

Thus, no Defendant is a mortgagee, noteholder, creditor, or party entitled to enforce.

## C. The Original Note Was Destroyed Under 50 U.S.C. § 4305 — Copies Cannot Be Enforced

Under 50 U.S.C. § 4305(b)(2), when a financial instrument is converted into electronic book-entry form, the original paper instrument is destroyed. Therefore:

- no original note exists;
- no Defendant possesses it;
- only digital replicas and photocopies remain;
- photocopies cannot confer standing or support foreclosure;
- and Defendants have not satisfied UCC § 3-309 (lost-instrument requirements).

A destroyed instrument cannot be reconstructed, revived, or enforced. This defect is fatal.

## D. Only Copies Were Circulated to Third-Party Investors — Not the Debt and Not the Rights

Following securitization:

- only copies of the note were transferred;
- third-party certificate-holders—not Defendants—hold any alleged investment interest;
- no chain of title exists;
- no Defendant can identify the true creditor.

Copies used as "color of title" cannot:

- establish privity,
- revive a destroyed instrument,
- create creditor status,
- justify foreclosure, or
- support eviction.

Defendants are third-party interlopers with no rights in the alleged instrument.

## E. Defendants Ignored Plaintiff's December 30, 2024 Presentment Demands and Violated Texas Property Code § 51.002(b)(3)

Beginning December 30, 2024, Plaintiff served:

- an Affidavit of Fact,
- an Affidavit of Dispute,
- a Memorandum of Trust,
- an Adverse Claim of Title, and
- a Reversionary Interest Affidavit

to Jamie Dimon (a living man) and his corporate agents.

These notices demanded:

- presentment of the original note (UCC § 3-501),
- identification of the true creditor,
- accounting,
- all assignments and transfers,
- proof of consideration, and
- authority to enforce.

Defendants never rebutted any notice. Under commercial law, unrebutted affidavits become truth in commerce.

Furthermore, after April 15, 2025, the record owner became:

# R L FREEMAN TRUST
# (Recorded under RP-2025-13788)

Texas Property Code § 51.002(b)(3) mandates foreclosure notices be sent to the record owner. Defendants sent:

- no notice to the Trust,
- no notice to the Trust address,
- foreclosed in Plaintiff's individual name,
- evicted Plaintiff individually,
- sued the wrong party,
- and acted with full knowledge of the Trust's title.

Under Texas and Fifth Circuit law: A foreclosure against the wrong party is VOID, not voidable. Onwuteaka v. Cohen, 846 S.W.2d 889. VOID means:

- title never transferred,
- the sale is a nullity,
- eviction collapses,
- and no action can cure it.

## F. Historical Constitutional Structure Confirms Defendants Have No Jurisdiction Over Plaintiff's Private Moorish Trust Estate

Under Article IV of the Articles of Confederation (1777/1781), European inhabitants in North America were classified as:

- "free inhabitants," or

- "others" who were not citizens of any State,

depending on allegiance and naturalization.

Historically, most European immigrants on this land were:

- aliens,
- indentured laborers,
- servants, or
- individuals fleeing European monarchies.

Their political capacity was not inherent; it arose only through naturalization acts beginning in 1790.

By contrast, Moorish nationality was recognized by treaty before any naturalization statute existed.

This distinction matters because:

- neither the Articles of Confederation,
- nor the original constitutional structure

granted jurisdiction to:

- later-created corporations,
- statutory U.S. citizens, or
- foreign-titled BAR members

to interfere with private Moorish trust estates or to enforce destroyed securitized instruments.

This historical jurisdictional framework reinforces the absence of standing in this matter.


## G. No Original Note = No Standing = Motion to Dismiss Must Be Denied

Because Defendants:

- lack the original promissory note;
- cannot establish negotiation or chain of title;
- cannot prove consideration;
- cannot identify the creditor;
- admitted Chase is not the originating lender;
- rely on digital copies of a destroyed instrument; and

- foreclosed against the wrong party,

no Defendant has standing to enforce, foreclose, evict, or appear as a "creditor." Without standing, Defendants' Motion to Dismiss fails as a matter of law.

---

## V. DEFENDANTS' ASSERTION OF "NEW CLAIMS" IS FALSE — ALL CLAIMS WERE CLEARLY AND FULLY PLED

Plaintiff does not seek to add new causes of action through her Response. She merely elaborates on, clarifies, and supports the claims already pled in the First Amended Complaint. To the extent the Court construes any argument as beyond the four corners of the Amended Complaint, Plaintiff respectfully seeks that such argument be treated as clarification, or in the alternative, that leave to amend be granted under Rule 15 rather than dismissal with prejudice.

Defendants — through their attorneys Eric G. Carlson (Esq.) and Wm. Lance Lewis (Esq.) — argue that Plaintiff "raised new causes of action" in her Response. That argument is incorrect, misleading, and disproven by the record.

Every issue Defendants complain about was already pled in Plaintiff's First Amended Complaint, her original filings, or her sworn Affidavits of Fact—months before Defendants filed their Motion to Dismiss.

## A. Paragraphs 1–8 of the First Amended Complaint Already Plead the Core Claims

Plaintiff's First Amended Complaint expressly includes:

1. Trust Conveyance & Notice (April 4, 2025 conveyance into the R L FREEMAN TRUST, with certified-mail service to Chase and Franklin Credit).
2. Recorded Title (April 15, 2025 recordation under RP-2025-13788).
3. Chain of Title identifying the Trust as the lawful owner and PCF as an unlawful interloper.
4. Trust Law (irrevocable trust; Plaintiff as Grantor only—not owner).
5. Texas Property Code § 51.002(b)(3) (no foreclosure notice to the record title holder).
6. Texas Property Code § 24.0061(b) (premature writ of possession issued after only 3 days).
7. Mail Fraud (18 U.S.C. § 1341 — fraudulent mortgage documents mailed by Defendants).
8. Throckmorton Doctrine (fraud vitiates all instruments and judgments).

These alone defeat Defendants' claim of "new" theories.

## B. Plaintiff's Additional Filings Further Establish the Same Causes of Action

Months before Defendants filed their Motion to Dismiss, Plaintiff filed:

- Original Complaint
- Memorandum of Law
- Criminal Allegation Referral
- Affidavit of Fact and Adverse Claim
- Affidavit of Dispute
- Affidavit of Reversionary Interest

All of these filings—served and filed prior to Defendants' Motion—raised the same issues, including:

- lack of holder-in-due-course status,
- securitization, bifurcation, and destruction of privity,
- the original lender being Long Beach Mortgage Company (not Chase),
- FDCPA, TILA, and FCRA violations,
- fraudulent assignments and identity misrepresentation,
- mail and wire fraud,
- lack of standing under UCC Articles 3 and 9,
- trust-estate jurisdiction,
- violations of Texas Property Code,
- and void foreclosure.

These are not new claims—they are consistent, repeated, and supported by sworn notices beginning December 30, 2024.


## C. A Response May Elaborate on Claims Without Creating New Causes of Action

The law in the Southern District of Texas is clear:

## "A plaintiff may elaborate on facts and legal theories in her response to a motion to dismiss without creating a new cause of action."
## — Coleman v. U.S. Bank, 2014 WL 4230908 (S.D. Tex.)

Plaintiff's Response merely:

- added statutory citations,
- expanded on securitization and standing defects,
- clarified trust-estate jurisdiction,
- corrected Defendants' misstatements, and

- explained notice failures and due-process violations.

Elaboration is not amendment.

## D. Defendants' "New Claim" Argument Is a Diversion From Their Failure to Rebut the Evidence

Defendants raise this objection because they failed to rebut:

- securitization and conversion of the note,
- lack of standing under Articles 3 and 9,
- trust-estate ownership and jurisdiction,
- statutory notice defects, and
- Plaintiff's unrebutted sworn affidavits.

Calling properly pled claims "new" is a litigation tactic—not a valid legal argument.

Conclusion for Section V

All claims were clearly, repeatedly, and timely pled. Defendants' "new claims" assertion is false and must be rejected as contrary to the record and controlling law. These are not new claims— they are consistent, repeated, and supported by sworn notices beginning December 30, 2024.

---

## VI. REBUTTAL TO DEFENDANTS' FIDUCIARY DUTY ARGUMENT — TOWNSEND IS MISPLACED

Defendants argue that "no fiduciary duty exists between a mortgagee and mortgagor" and cite Townsend v. BAC Home Loans Servicing, 461 F. App'x 367 (5th Cir. 2011). This argument misstates the law and mischaracterizes Plaintiff's actual claims.

## 1. Plaintiff Is Not Alleging a Traditional Lender–Borrower Fiduciary Duty

Plaintiff's claims arise from the fact that the Deed of Trust functioned as a tri-partite trust instrument, consisting of:

- Grantor — Plaintiff
- Trustee — holding bare legal title
- Beneficiary — originally Long Beach, later unknown certificate-holders

Defendants assumed fiduciary obligations when they:

- exercised control over trust property,

- acted as servicers or agents for unidentified investors, and
- handled trust res (the real estate and the securitized instrument).

This is not the simple lender–borrower relationship addressed in Townsend. Plaintiff's claims arise under trust law, not mortgage law.

## 2. A Deed of Trust Creates a Trust Relationship — Not a Bilateral Mortgage Contract

The controlling definitions establish that a Deed of Trust is a trust, not merely a mortgage:

# "A right of property, real or personal, held by one party for the benefit of another."
# — Goodwin v. McMinn, 193 Pa. 646 (1899)
# — Boyce v. Mosely, 102 S.C. 361 (1915)
# — King v. Richardson, 136 F.2d 849 (4th Cir. 1943)

Federal decisions reaffirm:

# "A Deed of Trust... places legal title in one or more trustees... Though differing in form from a mortgage, it is essentially a security."
# — Bank v. Pierce, 144 Cal. 434
# — In re Sherman, 12 F. Supp. 297

Thus the Deed of Trust created a security trust, which carries fiduciary obligations.

## 3. Fiduciary Duties Automatically Attach in Trust Relationships

Under:

- Restatement (Second) of Trusts § 170
- Restatement (Third) of Trusts § 78
- 12 U.S.C. § 92a
- SEC v. Capital Gains Research Bureau, 375 U.S. 180 (1963)

any party acting over trust property — including servicers, trustees, substituted trustees, agents, and certificate-holder representatives — owes fiduciary duties.

Accordingly, Defendants cannot rely on the Deed of Trust for enforcement while denying the fiduciary obligations that come with it. To the extent the Court deems that any fiduciary-duty theory was not labeled as a separate cause of action in the Amended Complaint, Plaintiff clarifies that such duties are pled as part of her trust, title, and slander-of-title claims, and in the alternative, she seeks leave to amend to expressly label them.

Conclusion to Section VI

Townsend is irrelevant. Plaintiff invokes trust law, not a bilateral mortgage contract. Defendants assumed fiduciary duties when they acted over trust res. Their fiduciary-duty argument fails as a matter of law.

# VII. REBUTTAL TO DEFENDANTS' "THIRD-PARTY STATUS" ARGUMENT

Defendants claim that Plaintiff's "third-party status" argument is "unsupported" and that Plaintiff "does not identify" any filing containing such an admission. The record directly contradicts Defendants' assertion.

In Defendants' own Reply (Doc. 57), Section I, "Nature and Stage of Proceeding," Defendants expressly state:

## "Plaintiff purchased the property with two loans from Long Beach Mortgage Company..."

This is a binding judicial admission, establishing that:

- Long Beach Mortgage Company — not JPMorgan Chase — was the alleged originating lender;
- the alleged obligation originated with Long Beach, not Chase;
- JPMorgan Chase never funded, signed, negotiated, or issued the alleged note; and
- any claim Chase asserts is necessarily derivative, secondary, and third-party in nature.

Under UCC §§ 3-301, 3-302, 3-203, and Article 9, a third party cannot enforce a negotiable instrument unless it proves:

1. possession of the original wet-ink note;

2. a continuous chain of negotiation;
3. proof of beneficial ownership; and
4. proof of lawful consideration/value.

Defendants have provided none of these.

Further, under 15 U.S.C. § 1692a(6) (FDCPA): A party attempting to collect a debt it did not originate is a debt collector, not a creditor. By Defendants' own admission, Chase is a third-party servicer/debt collector, not a creditor. This directly supports Plaintiff's FDCPA claims and confirms that Defendants are third-party interlopers with no standing to enforce any alleged obligation.

# VIII. DEFENDANTS' RELIANCE ON MARTINS FAILS — SECURITIZATION AND STANDING CONTROL

Plaintiff is not asserting that Texas law requires production of a wet-ink note in every foreclosure; she asserts that, where standing, ownership, and chain of title are disputed and securitization has severed privity, a party cannot foreclose or move to dismiss without first proving it is "entitled to enforce" under UCC § 3-301.

Defendants rely heavily on Martins v. BAC Home Loans Servicing, 722 F.3d 249 (5th Cir. 2013), arguing that "split-the-note" theories fail and that production of the original note is unnecessary. Their reliance on Martins is misplaced for several reasons:

## 1. In Martins, ownership was not in dispute

In Martins:

- the foreclosing servicer acted on behalf of the acknowledged mortgagee;
- standing was not contested;
- no securitization or chain-of-title issues were present.

Here, however:

- Long Beach Mortgage Company is defunct;
- Washington Mutual collapsed;
- the FDIC Purchase & Assumption Agreement expressly states Chase did NOT assume borrower liabilities;
- the alleged note was securitized, destroying privity;
- no party claims to be the mortgagee or beneficiary;
- no chain of negotiation exists.

## 2. Major authorities distinguish or override Martins when securitization destroys standing

Courts across the country reject foreclosure attempts where standing cannot be proven:

- In re Veal, 450 B.R. 897 (9th Cir. BAP 2011)
- U.S. Bank v. Ibanez, 941 N.E.2d 40 (Mass. 2011)
- Deutsche Bank Nat'l Trust Co. v. Johnston, 369 P.3d 1046 (N.M. 2016)
- In re Agard, 444 B.R. 231 (E.D.N.Y. 2011)
- Yvanova v. New Century Mortgage, 365 P.3d 845 (Cal. 2016)

These cases confirm: A party cannot foreclose without proving it is entitled to enforce the note under UCC § 3-301.

## 3. Even within the Fifth Circuit, Reinagel rejects Defendants' position

Reinagel v. Deutsche Bank, 735 F.3d 220 (5th Cir. 2013), holds:

- the foreclosing party must be the mortgagee or
- must act on behalf of the mortgagee.

Here:

- Chase is not the mortgagee,
- Chase is not the beneficiary,
- Chase is not acting on behalf of any proven owner,
- and no securitization trustee has appeared.

Conclusion for Section VIII

Martins applies only where the mortgagee's identity is undisputed and standing is established. Here, securitization, corporate dissolution, and the FDIC's own disclaimers eliminate standing at the threshold. Martins cannot rescue a party with no note, no chain, no consideration, and no creditor status.

## IX. REBUTTAL TO DEFENDANTS' ASSERTION THAT PLAINTIFF "PURCHASED THE PROPERTY WITH TWO LOANS"

Defendants repeatedly assert that Plaintiff "purchased the property with two loans" and is now attempting to "avoid an obligation she voluntarily assumed." This statement is misleading for two reasons:

## 1. No lawful "loan" occurred — no bank consideration was ever provided

A valid loan requires consideration, meaning the lender must give something of value. Defendants have provided no evidence that:

- Long Beach funded the transaction with its own assets;
- lawful money (gold or silver) was exchanged;
- any bank bore risk of loss; or
- any party extended actual value.

Black's Law Dictionary and numerous authorities confirm:

- A loan requires delivery of money or something of value.
- Banks cannot lend credit.
  - Citizens' Nat'l Bank of Cameron v. Good Roads Gravel Co., 236 S.W. 153 (Tex. Civ. App. 1921)
  - First Nat'l Bank v. Crespi & Co., 217 S.W. 705 (Tex. Civ. App. 1920)

Instead:

- the promissory note signed by Plaintiff created the asset;
- the bank used Plaintiff's signature as the source of funds;
- the note was monetized and securitized;
- no bank funds were ever put at risk.

Thus, Defendants' "loan" narrative is factually and legally incorrect.

## 2. Defendants' own admission proves they are third-party interlopers

By admitting the alleged loans originated from Long Beach Mortgage Company, Defendants have conceded:

- Chase did not originate the transaction;
- Chase never signed the note;
- Chase never funded the note;
- Chase never acquired the note through lawful negotiation;
- Chase is a third-party servicer at best.

Under UCC Articles 3 and 9, a party with:

- no consideration,
- no chain of title,
- no beneficial interest, and
- no original note

has no standing to foreclose or enforce anything.

Conclusion for Section IX

Defendants' assertion that Plaintiff "purchased the property with two loans" is legally false. No lawful consideration was ever provided, and Defendants themselves admit Chase is not the allege

lender. Because the alleged obligation was never funded by Chase — and because the note was securitized, bifurcated, and destroyed — the claim that Plaintiff "purchased the property with loans" is a misrepresentation.

---

## X. REBUTTAL TO DEFENDANTS' "TREATY RIGHTS ARE IRRELEVANT" ARGUMENT

Defendants assert that Plaintiff's "treaty rights" are irrelevant and that her Moorish American nationality "does not exempt her from the laws of Texas or the United States." This misstates Plaintiff's position and ignores controlling constitutional structure.

Plaintiff does not claim "exemption" from law. Plaintiff asserts which law governs when a treaty-recognized national, with a private trust estate, is dealing with third-party corporate actors on Moorish land.

### 1. Treaties Are the Supreme Law of the Land

Article VI, Clause 2 of the U.S. Constitution provides that:

## "All Treaties made… shall be the supreme Law of the Land…"

Treaties are not optional. Federal and state courts are bound to give them effect, particularly where nationality and private-estate interests are implicated. Plaintiff's reliance on treaty obligations is therefore squarely within the constitutional framework, not outside of it.

### 2. The Treaty of Peace and Friendship Predates Defendants' Corporate Existence

The Treaty of Peace and Friendship (1787/1836) recognizing Moorish nationality and diplomatic status predates:

- the Constitution of 1789 in its present amended form,
- all federal naturalization statutes (including the 1790 Act),
- Texas statehood, and
- the creation of JPMorgan Chase, Franklin Credit, and all Defendant corporations.

Defendants cite no authority that repeals, voids, or supersedes this treaty. Under Article VI, that treaty remains part of the supreme Law of the Land.

### 3. Treaty-Recognized Nationality Is Distinct from Statutory "U.S. Citizenship"

Plaintiff's status as a Moorish American national is grounded in treaty recognition and pre-constitutional instruments, not in later Fourteenth Amendment–based statutory "U.S. citizen" status created for corporate persons and federal subjects.

This is directly relevant to:

- jurisdiction,
- political capacity, and
- the treatment of her private trust estate (including the R L FREEMAN TRUST).

Plaintiff's position is that treaties and constitutional protections constrain what later-formed corporate actors and state instrumentalities may do to a private Moorish estate — not that Plaintiff is "above the law."

Accordingly, Defendants' broad statement that "treaty rights are irrelevant" is incompatible with Article VI and ignores the binding effect of treaties where nationality and private property are at issue.

## XI. HISTORICAL STATUS OF EUROPEAN IMMIGRANTS AND WHY IT MATTERS HERE

Plaintiff does not raise historical context for rhetoric, but because status determines jurisdiction, especially in disputes over private estates and trust property.

## 1. European Immigrants Held No Original Political Status on This Land

Under Article IV of the Articles of Confederation (1777/1781), European inhabitants residing in North America at the time were legally classified as:

- "free inhabitants," or
- "others" who were not citizens of any State,

depending on their political allegiance and naturalization status.

Historical records show that most European immigrants present in North America during the late 1700s were treated in law as:

- aliens,
- indentured laborers,
- servants,
- paupers or vagrants, or
- fugitives and political refugees from European monarchies.

Their political capacity on this land was not inherent — it was conferred only through later legislative naturalization processes beginning with the 1790 Naturalization Act.

## 2. By Contrast, Moorish Nationality Was Recognized by Treaty

The Treaty of Peace and Friendship (1787/1836) formally recognized Moors and their political identity. That treaty:

- predates the 1790 Naturalization Act,
- predates later corporate-federal structures (including the 1871 municipal corporate government), and
- predates the existence of all Defendant banking corporations.

Under Article VI, treaty-based nationality is part of the supreme Law of the Land and must be honored where nationality and private property are at issue.

## 3. Why This History Matters to This Case

This history goes to jurisdiction over Plaintiff and her private estate, not "exemption" from law.

Plaintiff's position is not that she is "above" Texas or U.S. law, but that:

- her status as a Moorish American national is grounded in a pre-existing treaty framework;
- her private property and trust estate must be viewed through that framework; and
- third-party U.S. corporate actors, whose own legal existence is later in time, cannot simply dismiss that treaty status as "irrelevant" while attempting to act as de facto trustees over her private Moorish estate.

## 4. Connection to the R L FREEMAN TRUST

Within this treaty and constitutional structure, Plaintiff's April 4, 2025 conveyance of 703 Deveron Lane into the R L FREEMAN TRUST is not a frivolous tactic — it is the exercise of a private estate right by a treaty-recognized Moorish national.

Defendants, as:

- later-formed U.S. corporations,
- third-party servicers with no privity, and
- non-beneficiaries of the private trust,

have no lawful authority to unilaterally declare that treaty-based nationality or the private trust estate is "irrelevant" while simultaneously trying to foreclose upon and dispossess that estate.

Accordingly, Defendants' attempt to wave away Plaintiff's treaty-based nationality and trust-estate framework as "irrelevant" is inconsistent with Article VI, with the historical development

of federal nationality law, and with their own status as third-party corporate actors seeking to reach a private Moorish trust estate.

---

## XII. REBUTTAL TO SECTION F — GOLD & SILVER AND LAWFUL MONEY

Defendants argue that Plaintiff's position regarding gold and silver "fails" and suggest that Plaintiff claims "all mortgages after 1933 are void." That misstates Plaintiff's argument and ignores basic contract principles.

Plaintiff's actual position is:

- A valid contract requires lawful consideration.
- A bank cannot loan what it does not possess.

This goes to the validity of this alleged mortgage, not "all mortgages."

## 1. Constitutional Tender Cannot Be Changed by Statute

Article I, § 10 of the U.S. Constitution provides:

# "No State shall... make any Thing but gold and silver Coin a Tender in Payment of Debts."

Only an Article V amendment can alter this mandate. No constitutional amendment has ever repealed or modified this provision.

## 2. HJR-192 and Emergency Banking Acts Did Not Amend the Constitution

- HJR-192 (June 5, 1933) and the Emergency Banking legislation removed gold and silver from domestic circulation and created a discharge-only system.
- 12 U.S.C. § 95a(2) speaks in terms of "acquittance and discharge", confirming a discharge framework, not true payment in constitutional tender.

These measures did not, and could not, repeal Article I, § 10. They created a statutory discharge system, not a constitutional amendment.

## 3. Federal Reserve Notes Are Obligations, Not Lawful Money

- Under 12 U.S.C. § 411, Federal Reserve Notes are "obligations of the United States," redeemable only in like obligations.
- Under Clearfield Trust Co. v. United States, 318 U.S. 363 (1943), when the United States deals in commercial paper, it acts as a private corporation, not as sovereign.

Functionally, a Federal Reserve Note is:

- a debt instrument,
- not gold or silver coin,
- and does not satisfy the original constitutional standard of lawful tender.

## 4. Effect on This Case — Lack of Lawful Consideration

Plaintiff does not claim that "all mortgages after 1933 are void." Plaintiff claims that this alleged contract lacked lawful consideration because:

- no lawful money ever changed hands;
- the alleged "loan" was funded by credit created from Plaintiff's own signature, not from bank assets;
- the "funds" were bookkeeping entries, not constitutional tender.

Under UCC §§ 3-104, 3-303 and basic contract law:

- an instrument without consideration is void or void ab initio.

## 5. No Mortgage Contract Can Be Formed Without Lawful Consideration

A valid mortgage requires:

1. mutual assent; and
2. lawful consideration of value.

Yet banks do not loan:

- gold,
- silver, or
- anything of tangible value they actually own.

Banks loan credit, created from a customer's signature and internal entries.

Authorities (as cited by Plaintiff) establish that:

- banks cannot lend what they do not have;
- a promise to pay cannot serve as the consideration for another promise to pay;
- Federal Reserve Notes function as commercial paper, not constitutional money.

Thus, where no lawful consideration was ever delivered, no valid mortgage contract could have been formed at inception.

## 6. Plaintiff's Argument Is Contractual, Not "Ideological"

Defendants state, "Plaintiff identifies no authority." But authority exists in:

- Constitutional law (Art. I §§ 8 & 10),
- statutory law (12 U.S.C. § 411, 12 U.S.C. § 95a(2)),
- case law (including Clearfield Trust), and
- commercial law (UCC Article 3).

Plaintiff is not arguing that every post-1933 mortgage is void. Plaintiff is arguing that:

- this alleged mortgage failed for lack of lawful consideration;
- Defendants furnished no lawful money;
- the "loan" was a credit transaction built on Plaintiff's own signature and securitization; and
- a contract based on non-existent consideration is void.

Accordingly, Defendants' Section F argument fails because it attacks a position Plaintiff never took and ignores the actual constitutional, monetary, and contract defects Plaintiff has consistently alleged from the beginning of this case.

---

## XIII. TILA / REGULATION Z VIOLATIONS (TIED TO "LOAN" & COLORABLE CLAIM)

Plaintiff has pled ongoing and continuing disclosure violations, including failures to provide accurate creditor information and transfers under 15 U.S.C. § 1641(g), and concealment of securitization and the true nature of the transaction. These are not merely historic, closed events at origination, and to the extent any limitations question arises, it is inappropriate to resolve on a motion to dismiss where continuing violations and equitable tolling are in play.

Defendants' Reply also fails to confront Plaintiff's detailed TILA and Regulation Z allegations, which are directly tied to the misuse of the term "loan" and concealment of the true nature of the transaction.

Key points:

1. Failure to Disclose the True Creditor
   - 12 C.F.R. §§ 1026.17–18 require disclosure of the true creditor and source of funds.
   - Defendants never disclosed that no lawful money was advanced, that Plaintiff's signature created the asset, or that the note was destined for securitization.

2. Failure to Disclose Assignments and Transfers
   - 15 U.S.C. § 1641(g) requires notice of each transfer of ownership within 30 days.
   - Defendants rely on post-hoc assignments created years later with no continuous chain.
3. Concealment of Securitization
   - Securitization is a material term that changes the relationship from bilateral lender–borrower to multi-party investor trust.
   - Defendants never disclosed securitization, contrary to Regulation Z's requirement to disclose all material terms.
4. False "Amount Financed"
   - If the bank never provided lawful consideration, the "amount financed" disclosure was materially false.
5. Effect on Consummation and Rescission
   - Material disclosure failures keep the right of rescission open under 15 U.S.C. § 1635 and 12 C.F.R. § 1026.23.
   - A non-consummated transaction cannot support a valid deed of trust or foreclosure.

Defendants' silence on these points further confirms the sufficiency of Plaintiff's TILA claims at the pleading stage.

---

## XIV. FDCPA — DEFENDANTS IGNORE THE DEFAULT-TIMING EXCEPTION IN 15 U.S.C. § 1692a(6)(F)

Plaintiff has alleged — and the record supports — that Jamie Dimon, doing business as CEO of JPMorgan Chase Bank, N.A., and JPMC itself first became involved only after the alleged obligation was already in default. Under the FDCPA, this timing is dispositive.

15 U.S.C. § 1692a(6)(F) expressly excludes from the "creditor exemption" any party that obtains a debt after it is already in default. Such a party is treated as a "debt collector," not a creditor, regardless of whether it is a mortgage servicer or financial institution.

Thus:

- Mortgage companies can be debt collectors under the FDCPA when the debt was in default at the time they obtained it.
- Defendants' repeated reliance on the general rule ("mortgage companies are not debt collectors") deliberately omits the statutory exception that applies here.
- Plaintiff's allegations fit squarely within the default-timing exception, making the FDCPA entirely applicable.

Defendants do not dispute — and cannot dispute — Plaintiff's core allegation that JPMC did not originate the alleged obligation, did not fund it, did not sign it, and acquired its claimed interest

only after default. This places JPMC and its CEO within the FDCPA's definition of "debt collector," making their FDCPA argument legally deficient.

---

## XV. PERSONAL JURISDICTION OVER JAMIE DIMON IS PROPER

Defendants argue this Court lacks personal jurisdiction over Jamie Dimon. That is not correct.

- Under International Shoe Co. v. Washington, 326 U.S. 310 (1945), jurisdiction exists where a defendant has minimum contacts arising from purposeful availment.
- Under Calder v. Jones, 465 U.S. 783 (1984) and Keeton v. Hustler Magazine, 465 U.S. 770 (1984), corporate officers are subject to jurisdiction when they personally direct, authorize, or ratify tortious conduct aimed at the forum.

JPMorgan Chase:

- operates branches throughout Texas;
- services mortgage loans in Texas;
- sends collection and foreclosure correspondence into Texas;
- reports Texas consumers to credit bureaus; and
- enforces foreclosure and eviction processes in Texas.

Jamie Dimon, doing business as CEO, directs and oversees the policies and systems under which these acts occur. Plaintiff's injuries—unlawful collection, foreclosure, clouding of title, and dispossession—occurred in Texas as the foreseeable result of those policies. Under the "effects" test, this is sufficient for personal jurisdiction.

---

## XVI. STATUTORY AUTHORITY SUPPORTING SLANDER OF TITLE & QUIET TITLE

Defendants argue that Plaintiff "fails to allege" the elements of slander of title and quiet title and that their lien and foreclosure are "valid" as a matter of law. That is incorrect. Multiple Texas statutes, federal provisions, and Uniform Commercial Code sections directly support Plaintiff's claims and show that the lien, foreclosure, and subsequent filings are void and constitute actionable clouds on title.

### A. Texas Property Code – Notice to the Record Owner (Trust)

Texas law requires foreclosure notices to be sent to the record title holder, not merely to a former individual owner.

- On April 4, 2025, Plaintiff conveyed all right, title, and interest in 703 Deveron Lane into the R L FREEMAN TRUST.
- On April 15, 2025, that conveyance was recorded under Doc. No. RP-2025-13788 in the Harris County real property records.
- From that date forward, the Trust was the record title holder.

Texas Property Code § 51.002(b)(3) requires that foreclosure notices be mailed to the debtor and to the proper party reflected in the servicer's records and land records. By failing to notice the

Trust at all, Defendants proceeded against the wrong party and violated the statutory notice scheme.

Likewise, Texas Property Code § 13.001(a) provides that a properly recorded instrument is "notice to all persons of the existence of the instrument." Once the Trust deed was recorded, all Defendants were on constructive notice that title resided in R L FREEMAN TRUST—not in Plaintiff individually. Defendants cannot claim ignorance of a filing that they themselves later attached as an exhibit.

A foreclosure conducted without statutory notice to the actual record owner is void and creates a cloud on title, giving rise to quiet title and slander of title claims.

### B. Texas Property Code – Eviction, Writ Timing, and Jurisdiction

Plaintiff also alleged that a writ of possession issued only three days after the final judgment, in violation of Texas Property Code § 24.0061(b), which requires a statutory waiting period before issuance of a writ of possession.

Issuing and executing a premature writ:

- violates statutory timing,
- invades possession without lawful authority, and
- compounds the cloud on title and wrongful dispossession.

These allegations are already in the Amended Complaint and reinforce that Plaintiff has properly pled statutory violations linked to title and possession.

### C. Texas Civil Practice & Remedies Code – Fraudulent Real-Property Filings & Slander of Title

Defendants' attempt to frame slander of title as "unsupported" ignores the Texas statutes that directly regulate fraudulent filings.

- Tex. Civ. Prac. & Rem. Code § 12.002(a) prohibits a person from making, presenting, or using a document with:

1. knowledge that the document is fraudulent,
2. intent that it be given the appearance of validity, and
3. intent to cause another to suffer financial injury or mental anguish.

Recording a substitute trustee's deed, assignment, or foreclosure instrument that is known to be defective for lack of notice, lack of standing, improper party, or post-removal state-court action fits squarely within § 12.002.

Slander of title is also supported by Texas common law and by the concept that a recorded document that falsely asserts an adverse interest in real property constitutes publication that disparages Plaintiff's title and trust estate.

By recording instruments based on void actions and ignoring the Trust's recorded ownership, Defendants have published clouds on title that are actionable as slander of title and removable through quiet title.

## D. Uniform Commercial Code – Standing and Enforceability of the Alleged Lien

Defendants' claimed "valid lien" depends entirely on the enforceability of the alleged note and deed of trust under the Uniform Commercial Code. Their Reply never shows they satisfy these requirements.

Under UCC § 3-301, a party enforcing a note must be:

1. the holder,
2. a non-holder in possession with rights of a holder, or
3. a person otherwise entitled to enforce the instrument.

Under UCC § 3-203, transfer of an instrument requires proper negotiation and delivery. Under UCC § 9-203(b), a security interest (such as a deed of trust lien) is enforceable only if:

1. value has been given,
2. the debtor has rights in the collateral, and
3. there is an authenticated security agreement.

Here, Plaintiff has specifically alleged:

- Long Beach Mortgage was the original lender and is now defunct;
- Washington Mutual failed;
- the FDIC P&A Agreement expressly did not transfer borrower liabilities to JPMorgan Chase;
- Defendants cannot produce a continuous chain of endorsements or transfers; and
- no lawful consideration was ever provided to support a valid note.

Without proof of ownership, negotiation, value given, and a valid security interest, Defendants' claimed lien is not enforceable under the UCC. A lien that cannot lawfully be enforced is the very definition of a cloud on title and is properly challenged through quiet title.

## E. Concealed State-Court Actions and Void Orders Cannot Support Title or Defendants' "Valid Lien" Theory

Even apart from the federal removal statute, the state-court actions that Defendants rely on are independently void and cannot support any claim of a "valid lien" or lawful title transfer.

As set forth in Section XVII below:

- Harris County Civil Court staff repeatedly told Plaintiff that she had no active case, while individuals continued to appear at her private Moorish estate with:
    - fraudulent "notices,"
    - unfiled papers purporting to be court orders, and
    - non-docketed documents bearing no clerk's stamp or traceable cause number;
- Judge LaShawn A. Williams refused to produce:
    - any Oath of Office,
    - any bond, or
    - any Delegation of Authority Order ("DOAO") from Congress when Plaintiff demanded proof of jurisdiction and authority; and
- both Judge LaShawn A. Williams and Lincoln Hayes Goodwin are BAR-member Esquires, constitutionally disqualified from holding public office under the original Thirteenth Amendment (Titles of Nobility Amendment), and subject to 28 U.S.C. § 454, which makes it a high misdemeanor for a judge to engage in the practice of law.

Once Plaintiff challenged jurisdiction and demanded proof of authority, the court could not lawfully proceed without first establishing jurisdiction on the record. Proceeding anyway—while concealing the docket and refusing to show any lawful authority—renders:

- the purported "Final Judgment for Possession,"
- the premature Writ of Possession, and
- all derivative state-court instruments

void ab initio, not merely voidable.

A void judgment:

- transfers no title,
- creates no lawful lien, and
- cannot be cured by later actions or relied upon in federal court.

When void judgments, writs, and substitute trustee's deeds are nonetheless recorded in the county real-property records, they operate as false assertions of adverse interests in the land. That is the very definition of a cloud on title and fits squarely within:

- Texas Civil Practice & Remedies Code § 12.002 (fraudulent real-property filings), and
- common-law slander of title doctrines.

Accordingly, the state-court acts on which Defendants attempt to rely:

- are void for lack of jurisdiction and authority,
- cannot establish or validate any lien, and
- instead supply additional grounds for Plaintiff's quiet title and slander of title claims.

Plaintiff Has More Than Adequately Stated Claims

Taken together, these authorities and the facts set forth in Sections XVI and XVII show:

1. Texas Property Code §§ 51.002 & 13.001 – Defendants failed to notify the record title holder (the R L FREEMAN TRUST) and ignored a properly recorded conveyance (RP-2025-13788).
2. Texas Property Code § 24.0061(b) – Defendants acted on an unlawful, premature writ of possession issued before the statutory waiting period.
3. Tex. Civ. Prac. & Rem. Code § 12.002 – Defendants made, presented, and used fraudulent or void instruments (including a substitute trustee's deed and related filings) with the intent that they appear valid and cause injury, thereby creating clouds on title.
4. UCC Articles 3 & 9 – Defendants cannot show standing to enforce the alleged note or lien because they have not proven:
   - possession of the original wet-ink note,
   - a continuous chain of negotiation,
   - value given, or
   - a valid, enforceable security interest.
5. State-court "judgments" and writs are void – as detailed in Sections XVI and XVII, the Harris County proceedings were:
   - concealed and non-docketed,
   - conducted by BAR-member Esquires constitutionally disqualified from holding public office,
   - carried out without proof of jurisdiction, oath, bond, or Delegation of Authority Order, and
   - thus void ab initio and incapable of transferring title or supporting any lien.

These statutory provisions and jurisdictional defects directly support Plaintiff's causes of action for:

- slander of title, and
- quiet title / removal of cloud,

and confirm that dismissal is not appropriate at the pleading stage.

Plaintiff does not dispute that certain documents exist in the Harris County property records or in prior bankruptcy dockets. She disputes their legal effect. Judicial notice under Fed. R. Evid. 201

permits the Court to notice the existence and filing of public records, but not to accept as true the contested factual assertions or legal conclusions contained in those records. Void judgments, fraudulent instruments, and clouds on title do not become valid simply because they are recorded.

## XVII. STATE-COURT PROCEEDINGS WERE CONCEALED, NON-DOCKETED, AND VOID FOR LACK OF JURISDICTION

Plaintiff clarifies that she was prevented from filing a formal Notice of Removal at the time of the Harris County Civil Court proceedings because court staff repeatedly informed her:

## "You do not have any active case here."

This occurred even while individuals continued to arrive at Plaintiff's private Moorish estate with:

- fraudulent "notices,"
- unfiled papers purporting to be court orders, and
- non-docketed documents with no clerk's stamp or traceable case number.

Thus, the court:

1. hid the case from Plaintiff,
2. refused to acknowledge the existence of proceedings, and
3. simultaneously acted against Plaintiff's estate in secret,

denying her the ability to access the docket or assert her federal rights.

## 1. Plaintiff Still Placed the Court on Notice and Challenged Jurisdiction

Despite the court concealing its docket, Plaintiff did put the court on notice through:

- a Writ and Caveat challenging jurisdiction,
- written demands for:
    - Oath of Office,
    - Bond,
    - Delegation of Authority Order ("DOAO"),
    - Constitutional authority,
- oral jurisdiction challenges at the clerk's counter,
- and notice that a federal case concerning the same property (4:25-cv-02013) was pending.

Judge LaShawn A. Williams refused to produce any DOAO, oath, bond, or lawful authority when Plaintiff directly requested them.

## 2. Once Jurisdiction Is Challenged, a Court Cannot Proceed Without Proving It

It is long-established:

> "Jurisdiction challenged is jurisdiction denied until proven."
> — Hagans v. Lavine, 415 U.S. 528

Judge Williams proceeded without proving jurisdiction. This alone renders every action void, not voidable.

## 3. BAR Members Are Constitutionally Disqualified From Holding Public Office (TONA)

Judge LaShawn A. Williams (Texas Bar #00795721) and Lincoln Hayes Goodwin (Texas Bar #24007249) are Esquires, a foreign title prohibited under the original Thirteenth Amendment (Titles of Nobility Amendment):

> "No person holding a Title of Nobility or Honor shall... hold any office of trust or profit under the United States."

A constitutionally disqualified person cannot lawfully sit as a judge or issue orders. Thus:

- the "Final Judgment for Possession,"
- the Writ of Possession,
- and all subsequent state-court filings

are void as a matter of constitutional law.

## 4. 28 U.S.C. § 454 — Judges Practicing Law Commit a High Misdemeanor

28 U.S.C. § 454 states:

> "Any justice or judge who engages in the practice of law is guilty of a high misdemeanor."

A BAR-member "judge" who refuses to show:

- Delegation of Authority Order,
- oath of office,
- bond,
- or constitutional authority,

is not acting as a judge—she is practicing law privately from the bench, violating § 454. Acts issued by a judge acting as a private attorney are void ab initio.

## 5. When a Court Conceals a Case and Proceeds Without Authority, ALL Orders Are Void

Because the state-court actors:

- denied Plaintiff access to the docket,
- refused to acknowledge an active case existed,
- refused to show lawful authority,
- ignored Plaintiff's jurisdiction challenge,
- ignored Plaintiff's trust-estate status,
- ignored the pending federal case,
- and proceeded as BAR-disqualified actors,

every act taken is:

- VOID for lack of jurisdiction,
- VOID under the original 13th Amendment,
- VOID under 28 U.S.C. § 454,
- VOID for failure to prove judicial authority,
- VOID as a violation of due process,
- VOID because the "judge" was constitutionally prohibited from holding office.

A void judgment:

# "is no judgment at all, and may be attacked at any time, in any court."
# — Ex parte Reed, 100 U.S. 13 (1879)

Therefore:

- the purported "Final Judgment for Possession,"
- the premature Writ of Possession,
- the substitute trustee's deed,
- the foreclosure sale,
- the eviction,
- and all derivative filings

have no legal force, cannot transfer possession, and cannot support Defendants' Motion to Dismiss.

## XVIII. NOTICE REGARDING SERVICE FAILURES AND REQUEST FOR CERTIFIED-MAIL SERVICE FROM DEFENDANTS' COUNSEL

Plaintiff places the Court and Defendants' counsel on notice of a material service defect that has arisen during the pendency of this case.

1. Electronic CM/ECF notifications have ceased without explanation.

   Electronic notifications from the Court's CM/ECF system (DCECF_LiveDB@txs.uscourts.gov) have stopped without explanation. Plaintiff is no longer receiving electronic filing notifications or docket activity. This creates a due-process concern and impairs Plaintiff's ability to timely respond to filings.

2. Defendants' counsel elected electronic service without Plaintiff's consent.

   Defendants' counsel unilaterally rely on electronic service. Plaintiff has made no agreement to waive Special Appearance, general jurisdiction, or to consent to electronic service under Fed. R. Civ. P. 5(b)(2)(E). Because Plaintiff appears sui juris and is not a CM/ECF-registered attorney, electronic service is not valid unless expressly consented to in writing — which Plaintiff has not done.

3. Demand for Certified-Mail Service Going Forward.

   Effective immediately, Plaintiff directs Defendants' attorneys — including Eric G. Carlson and Wm. Lance Lewis, counsel for JPMorgan Chase Bank, N.A. and Jamie Dimon — to serve all motions, notices, responses, and other filings by:

   ## Certified Mail – Return Receipt Requested

   ## addressed to:

   ## Rachael Griffin-El

   ## P.O. Box 90008

   ## Houston, Texas Republic [77290]

4. Authority Supporting Plaintiff's Request.

- o Fed. R. Civ. P. 5(b)(2)(C) permits service by mail where electronic consent is absent.
- o Due process requires actual notice of filings affecting a party's rights.
- o Special Appearance is not waived by requiring proper service.
- o Failure of electronic notice triggers the right to request reliable alternative service.

5. Defective Service Will Be Treated as Such.

Any filing not served by Certified Mail — until Plaintiff confirms restoration of reliable notice — will be considered improperly served. Plaintiff reserves the right to:

- o object,
- o request re-service, or
- o move to strike filings not properly served.

Plaintiff does not oppose the Court's electronic systems generally; however, when those systems fail, due process requires a reliable method. Certified Mail ensures accuracy, tracking, and proof of delivery.

All rights strictly reserved under U.C.C. 1-308; Special Appearance preserved.

---

## XIX. CONCLUSION

For all of the reasons stated herein, Defendants' Reply is built on misstatements, omissions, and avoidance of the controlling issues. Defendants:

- mischaracterize Plaintiff's use of the word "discharge" and continue to inject bankruptcy into this matter despite Plaintiff never relying on bankruptcy for any claim;
- ignore the unrebutted April 4, 2025 conveyance into the R L FREEMAN TRUST and the April 15, 2025 recording under RP-2025-13788;
- do not dispute their failure to serve the record title holder as required by Texas Property Code § 51.002(b)(3);
- do not rebut the violation of Texas Property Code § 24.0061(b) (premature writ of possession);
- refuse to address securitization, bifurcation of the note, or destruction of privity under UCC Articles 3 and 9;
- fail to prove possession, negotiation, or ownership of the original promissory note;
- rely on Martins in circumstances where standing, ownership, and securitization render Martins inapplicable;
- admit Long Beach Mortgage Company was the original lender, confirming JPMorgan Chase is a third-party interloper, not a creditor;
- ignore Plaintiff's TILA, Regulation Z, FDCPA, and FCRA allegations; and
- misapply Townsend and other cases that do not govern securitized instruments and trust-law claims.

Defendants' Reply does not cure the defects in their Motion to Dismiss. Instead, it reaffirms them.

The Court must accept the well-pleaded facts of the Amended Complaint as true. Those facts — standing defects, trust-estate jurisdiction, statutory violations, chain-of-title failures, securitization, lack of consideration, and constitutional/treaty issues — are more than sufficient to state claims upon which relief may be granted.

Accordingly, Plaintiff respectfully and firmly requests that this Court:

1. Deny Defendants' Motion to Dismiss in its entirety;
2. Allow all claims against Jamie Dimon doing business as CEO of JPMorgan Chase Bank, N.A., to proceed;
3. Take judicial notice of the recorded Trust conveyance (RP-2025-13788) and Defendants' own Exhibit D acknowledging it;
4. Take judicial notice of Defendants' failure to serve the record owner; and
5. Grant all other relief the Court finds just, equitable, and proper — without waiving Special Appearance and under full reservation of rights U.C.C. 1-308.



Respectfully submitted,

Rachael Griffin-El, sui juris

Ex rel. RACHAEL LEE GRIFFIN

Living Moorish American Woman

P.O. Box 90008

Houston, Texas Republic [77290]

All Rights Reserved – Without Prejudice – U.C.C. 1-308

Non-Assumpsit • Special Appearance Only

## CERTIFICATE OF SERVICE

I, Rachael Griffin-El, sui juris, certify that on the 1st day of December, 2025, I served a true and correct copy of the foregoing Plaintiff's Sur-Reply to Defendants' Reply in Support of Defendants' Motion to Dismiss Amended Complaint upon Defendants' attorneys via Certified Mail, Return Receipt Requested, because the Court's CM/ECF electronic system failed to provide Plaintiff with proper notice of Defendants' filings dated November 7, 2025 and November 26, 2025, despite Defendants' attorney certifying service.

Therefore, to ensure actual service and to preserve due-process rights, Plaintiff effectuated service manually by Certified Mail, RRR, upon:

Eric G. Carlson, Attorney

WM. Lance Lewis, Attorney-in-Charge

QUILLING, SELANDER, LOWNDS, WINSLETT & MOSER, P.C.

2001 Bryan Street, Suite 1800

Dallas, Texas 75201

Certified Mail No.: 9589 0710 5270 3017 8026 64



**UNITED STATES POSTAL SERVICE**

KLEIN
7717 LOUETTA RD
SPRING, TX 77379-9998
www.usps.com

12/01/2025                    04:45 PM

------------------------------------------------

TRACKING NUMBERS
9589 0710 5270 3017 8026 64

------------------------------------------------

TRACK STATUS OF ITEMS WITH THIS CODE
(UP TO 25 ITEMS)



------------------------------------------------

TRACK STATUS BY TEXT MESSAGE
Send tracking number to 28777 (2USPS)
Standard message and data rates may apply

------------------------------------------------

TRACK STATUS ONLINE
Visit https://www.usps.com/tracking
Text and e-mail alerts available

------------------------------------------------

PURCHASE DETAILS

| Product | Qty | Unit Price | Price |
|---|---|---|---|
| First-Class Mail® Large Envelope | 1 | | $3.56 |

    Dallas, TX 75201
    Weight: 0 lb 7.60 oz
    Estimated Delivery Date
      Fri 12/05/2025

| Certified Mail® | | | $5.30 |

    Tracking #:
      9589 0710 5270 3017 8026 64

| Return Receipt | | | $4.40 |

    Tracking #:
      9590 9402 9427 5069 2976 93

| Total | | | $13.26 |

------------------------------------------------

Grand Total:                       $13.26

------------------------------------------------

Credit Card Remit              $13.26
  Card Name: MasterCard
  Account #: XXXXXXXXXXXX3759
  Approval #: 27120Z
  Transaction #: 124
  AID: A0000000041010   Contactless
  AL: MASTERCARD

------------------------------------------------

TO REPORT AN ISSUE
Visit https://emailus.usps.com

All hazardous labels/markings on reused
    boxes MUST be completely
removed/obliterated if they no longer
        match the contents.

In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
    Associate can show you how.

PREVIEW YOUR MAIL AND PACKAGES
      Sign up for FREE at
https://informeddelivery.usps.com

---

**U.S. Postal Service**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®

Dallas, TX 75201

Certified Mail Fee   $5.30

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)
☐ Return Receipt (electronic)
☐ Certified Mail Restricted Delivery
☐ Adult Signature Required
☐ Adult Signature Restricted Delivery

Postage   $1.84

Total Postage and Fees   $13.26

Sent To   Eric G Carlson Attorney of Jamie Dimon/Chase
Street and Apt. No., or PO Box No.   2001 Bryan Street Suite 1800
City, State, ZIP+4®   Dallas Texas, 75201 near Unitedstate

PS Form 3800, January 2023 PSN 7530-02-000-9047   See Reverse for Instructions

9589 0710 5270 3017 8026 64